IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

17 MAR 21  PM 4:50

CLERK U.S. DISTRICT COURT
WESTERN DI          AS
BY_____
                DEPUTY CLERK

BREAION KING,

                Plaintiff,

-vs-                                                        Case No.  A-16-CA-1020-SS

THE CITY OF AUSTIN, TEXAS and OFFICER
BRYAN RICHTER,

                Defendants.

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant City of Austin, Texas (the City)'s Motion to Dismiss [#13], Plaintiff Breaion King (Plaintiff)'s Response [#15] in opposition, and the City's Reply [#16] in support. Having considered the documents, the governing law, and the file as a whole, the Court now enters the following opinion and order.

### Background[1]

This case arises out of Plaintiff's allegations she was subjected to excessive use of force and racial discrimination by Officer Bryan Richter of the Austin Police Department (APD) in the course of a routine traffic stop. Plaintiff claims Officer Richter and the City are liable to her under 42 U.S.C. § 1983 for violating her constitutional rights and under 42 U.S.C. § 1981 for violating her federal rights. Am. Comp. [#12] at 10.

---

[1]The recited facts are taken from Plaintiff's amended complaint and documents incorporated in the complaint.

## I.       Plaintiff's Arrest

Plaintiff is a black woman who weighs approximately 120 pounds and is about five feet, five inches tall. *Id.* at 5, 7. According to Plaintiff, she was driving home on I-35 in Austin, Texas during the early afternoon of June 15, 2015. *Id.* at 4. Plaintiff admits she was driving "slightly over the speed limit." *Id.* When Plaintiff observed a police patrol car flash its overhead lights in her rearview mirror, however, she believed the patrol car was pursuing a vehicle that had just sped past her. *Id.* Thus, Plaintiff continued driving, eventually pulling into a restaurant parking lot. *Id.*

After parking, Plaintiff opened the door of her vehicle and began to walk toward the restaurant when Officer Richter's patrol car also pulled into the parking lot. *Id.* at 4–5. A white male, Officer Richter asked Plaintiff to return to her vehicle, and Plaintiff complied. *Id.* After Plaintiff returned to her vehicle, Officer Richter approached. *Id.* at 5. With the driver-side door of the car open, Plaintiff was seated in the driver's seat with her legs outside the vehicle. *Id.* Plaintiff asked Officer Richter whether he could pull her over when she had already parked her car and stepped out, and Officer Richter informed her that she had been speeding and requested her driver's license. *Id.* Plaintiff reached under the car seat for her driver's license. *Id.*

Officer Richter asked Plaintiff to place her legs inside the vehicle. *Id.* Immediately, Officer Richter again asked Plaintiff to place her legs inside the vehicle. *Id.* Plaintiff did not refuse to place her legs inside the vehicle but was not given time to comply with the commands. *Id.* Officer Richter then demanded Plaintiff step out of the vehicle, grabbing her to pull her out of the car. *Id.*

Plaintiff claims Officer Richter, in attempting to rip her out of the car, slammed her "against the steering wheel, causing the car horn to honk in short bursts and a long, sustained burst . . . ." *Id.* Plaintiff pleaded for Officer Richter to stop touching her and allow her to get out of the car

-2-

voluntarily. *Id.* Ignoring Plaintiff's pleas, Officer Richter removed Plaintiff from her vehicle, slamming her against a nearby truck and then on to the parking lot pavement. *Id.* at 5–6. Officer Richter then positioned himself on top of Plaintiff, placing his elbow into Plaintiff's neck and attempting to handcuff her. *Id.* at 6. Plaintiff requested she be allowed to place her hands behind her back without them being forcefully yanked, but Officer Richter simply yelled at her to put her hands behind her back. *Id.* He then threatened to use his taser and Plaintiff screamed "Oh my god, why are you doing this to me?" *Id.*

Officer Richter then brought Plaintiff to her feet but attempted move her back to the ground by placing her in a chokehold and repeatedly kicking her legs out from under her. *Id.* Eventually, Plaintiff once again lay on the ground and Officer Richter handcuffed her. *Id.* At some point, another APD officer arrived. *See id.* Although Plaintiff was restrained and another officer was present, Officer Richter yanked Plaintiff off the ground by the chain of her handcuffs. *Id.*

Other officers soon arrived and asked Officer Richter for his account of the interaction with Plaintiff. *Id.* Officer Richter claimed Plaintiff had attempted to throw a punch at him and said "no" twice when he asked her to put her legs in the car. *Id.* He stated, "If she was a guy, man, I would have just hit her and been done with it." *Id.* Officer Richter then asked for Plaintiff to be charged with resisting arrest, saying "If they ask what she's resisting[,] just put arrest. If they ask specifically what she was resisting[,] say arrest. They won't care about that." *Id.*

Plaintiff requested to be transported by an officer other than Officer Richter, and she was placed Officer Spradlin's police car. *Id.* at 6–7. During the ride to the police station, the following conversation was recorded on video:

> **Officer Spradlin**: Well let me ask you this. Why are so many people afraid of black

people?

**Plaintiff:** That's what I wanna figure out! Because I'm not a bad black person.

**Officer Spradlin**: I can give you a really good . . . a really good idea of why it might be that way.

**Plaintiff**: Why?

**Officer Spradlin**: Violent tendencies. And I want you to . . . I want you to think about that. I'm not saying anything. . . I'm not saying it's true. I'm not saying I can prove it or nothing. But 99% of the time when you hear about stuff like that, it's the black community that's being violent. That's why a lot of the white people are afraid, and I don't blame them. There are some guys I look at . . . I, yeah . . . I know it's my job to deal with them and I know it's probably going to go ugly. . . But that's the way it goes. But yeah, some of them, because of their appearance or whatnot, some of them are very intimidating.

*Id.* at 7.

At the police station, Plaintiff was charged with resisting arrest. *Id.* Those charges were later dismissed "in the interest of justice." *Id.*

## II.   Officer Richter's History

According to Plaintiff's amended complaint, Officer Richter committed numerous excessive force violations against individuals but had not been disciplined for those violations before Plaintiff's arrest. *Id.* at 8. Plaintiff summarizes video evidence from three different incidents but includes no details on when the events occurred or the race of the individuals with whom Officer Richter interacted. *See id.*

In the first incident, Officer Richter pulled over a male driver and a female passenger. After the driver refused a breathalyzer test, the situation escalated. *Id.* Officer Richter placed the driver in a chokehold and forced him to the ground. *Id.* Recording the incident, the female passenger was ordered to return to her vehicle. *Id.* As she was returning to the vehicle, Officer Richter then grabbed

her from behind, kicked her legs out, and threw her to the ground. *Id.*

In the second incident Plaintiff summarizes, Officer Richter approached four individuals standing outside on the sidewalk. *Id.* Officer Richter began to handcuff one individual while a fellow officer arrested another. *Id.* Although the individual he was arresting offered no physical resistance, Officer Richter grabbed the individual by his neck and threw him violently to the ground. *Id.*

In the third incident, a car pulled out in front of Officer Richter's patrol car, causing Officer Richter to serve to avoid a collision. *Id.* He then pulled over the motorist. *Id.* After approaching the car and without any announcements, Officer Richter opened the car door and grabbed the motorist. *Id.* He told the motorist he would be tasered if he did not immediately get out of the car. *Id.* With two other officers, Officer Richter pulled the motorist out of the vehicle. *Id.* The motorist was tasered at least two times while on the ground. *Id.* The motorist was placed on the hood of Officer Richter's patrol car, and Officer Richter told the motorist, "If you kick me it'll be the last thing you do." *Id.*

## III.   APD Context

Claiming APD follows a custom or practice of racial targeting, Plaintiff cites a study released by the Center for Policing Equity (CPE) in October 2016 analyzing data from 2014 and 2015. *Id.* at 9. In particular, the CPE study reviewed APD data concerning vehicle stops resulting in citation or arrest in 2015 and incidents involving police use of force in 2014. PHILLIP ATIBA GOFF ET AL., CENTER FOR POLICING EQUITY, THE SCIENCE OF POLICING EQUITY 15 (2016). Particularly relevant here, the study reported that "[e]ven when controlling for neighborhood levels of crime, education, homeownership, income, youth, and unemployment, **racial disparities in both use and severity of force remained.**" *Id.* at 15 (emphasis in original). Plaintiff notes the study also "found that there are racial disparities in the decision to stop and search a suspect, and that 'Austin's neighborhoods with

-5-

a higher percentage of black or Hispanic residents experienced a disproportionate amount of police use of force.'" Am. Compl [#12] at 9.

In addition, Plaintiff cites a report by KXAN in her amended complaint, claiming the report "found numerous cases of officers over a five year period misreport[ed] on official documentation that black or Hispanic individuals who were arrested or received citations were 'white.'" *Id.* Plaintiff alleges that such a custom or practice "allows officers to avoid discipline for racially motivated arrests and citations." *Id.*[2]

Without specifying a date or elaborating on the context, Plaintiff also claims former Chief of Police Art Acevedo made statements in a recorded meeting "reprimanding APD supervisors." *Id.* at 9–10. In particular, Chief Acevedo stated, "'[W]e are at a crossroads in American policing. And the problem isn't the cops. The problem is the leadership.'" *Id.* at 10. He continued, "'And I am sickened that somehow people are still trying to justify Richter. Nobody wearing stripes, or bars or stars should even think about justifying . . . that the reason that woman got pulled out of that car is because she had the audacity to tell him to hurry up.'" *Id.* He also stated, "'Had that been a pretty white girl in her Sunday best dress, I don't think that Richter would have responded . . . that way.'" *Id.* Chief Acevedo asked, "'Who cares what he wrote [in the report]? Because I think we have this attitude, of I'll just cover it in the report and I'll be good to go . . . Anybody can do creative writing.'" *Id.* He also remarked, "'The problem is leadership that lacks the intestinal fortitude to make the tough calls. That rather than just call it the way it should be called, they try to mitigate for the officer, they try to act like their union rep. That is not our job.'" *Id.*

---

[2] Plaintiff provided no identifying information for this report nor did Plaintiff indicate the date it was published.

## IV.    Procedural History

Plaintiff filed her suit against the City and Officer Richter on August 8, 2016. Compl. [#1]. The City then filed a motion to dismiss alleging failure to state a claim. Mot. Dismiss [#4]. The Court granted the City's first motion to dismiss, finding Plaintiff only provided general allegations without the specific factual allegations necessary to establish a cause of action and granting Plaintiff leave to amend. Ord. of Oct. 14, 2016 [#9] at 2.

Subsequently, Plaintiff filed an amended complaint, Am. Compl. [#12], and the City again moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). Mot. Dismiss [#13]. The motion is now ripe for decision.

## Analysis

## I.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678. Although a plaintiff's factual allegations need not establish that the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," and must be performed in light of a court's "judicial

experience and common sense." *Id.* at 679.

In deciding a motion to dismiss under Rule 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). In deciding a motion to dismiss, courts may consider the complaint, as well as other sources such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## II.    Municipal Liability under § 1983

Under 42 U.S.C. § 1983, "[a]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject or cause to be subjected, any person to the deprivation of any rights, privileges or immunities secured by the Constitution of the United States, shall . . . be liable to the party injured . . . ." A municipality is a "person" subject to suit under § 1983. *See Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978). In *Monell*, however, the Supreme Court held a municipality can be liable under § 1983 only where the municipality itself causes the constitutional violation at issue. *See id.* at 694–95.

Specifically, a municipality can be sued "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Zarnow v. City of Wichita Falls,* 614 F.3d 161, 166 (5th Cir. 2010)

-8-

(quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). Alternatively, a municipality can be held liable "where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval." *Id.* (citing *Monell,* 436 U.S. at 690–91). Municipal liability under § 1983 requires proof of three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose moving force is the policy or custom. *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

## III.   Plaintiff's Allegations

Plaintiff alleges the City violated her constitutional rights to be free from the use of excessive force and free from racial discrimination in police actions because it:

> 1.] Had an inadequate policy for preventing use of force violations by its police officers;
>
> 2.] Had an inadequate training program for training its officers in the proper use of force;
>
> 3.] Had an inadequate hiring policy in that it failed to screen out potential officers who presented a plainly obvious risk of committing use of force violations;
>
> 4.] Had an inadequate disciplinary policy in that it failed to adequately punish, re-train, or sanction officers who committed excessive force violations;
>
> 5.] Was deliberately indifferent by the established unwritten custom, practice, or policy of racial targeting and racist motivations in its officers' uses of excessive force;
>
> 6.] Had an inadequate training program for training its officers with respect to the rights of citizens to be free from racism in law enforcement and excessive force in making arrests;
>
> 7.] Had an inadequate hiring policy in that it failed to screen out potential officers who presented a plainly obvious risk of taking law enforcement actions based on the race of the individuals who were the subjects of those actions; [ ]
>
> 8.] Had an inadequate disciplinary policy in that it failed to adequately discipline or

punish officers who violated the rights of citizens to be free from racially-motivated law enforcement actions[;]

9.] Had a custom, policy, or practice of using chokehold takedown maneuvers to arrest individuals unnecessarily[;]

10.] Had an inadequate training program in that officers are trained that the chokehold takedown maneuver is an acceptable use of force in arresting a suspect, even one who exhibits no resistance or minimal resistance[; and]

11.] Had a custom or practice of falsely reporting that the arrestee who was subjected to the use of excessive force was resisting arrest so the officer is able to avoid discipline for excessive force violations.

Am. Comp. [#12] at 3–4.

## IV.    Analysis

In its motion to dismiss, the City argues Plaintiff failed to provide (1) sufficient factual allegations of an official policy that resulted in the alleged excessive use of physical force by an officer or (2) that such policy was the moving force for a violation of constitutional rights. Mot. Dismiss [#13] at 4–17. The Court disagrees, finding Plaintiff pled sufficient facts to allow the Court to draw the reasonable inference that the City is liable for the misconduct alleged.

## A.    Official policy

For a § 1983 claim against a municipality, an official policy may be evidenced by custom that is "a persistent, widespread practice of City official or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy . . . ." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.3d 838, 841 (5th Cir. 1984)). To demonstrate a governmental policy or custom under § 1983, a plaintiff must at least show "a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct and/or that serious

-10-

incompetence or misbehavior was general or widespread throughout the police force." *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992).

However, specific details regarding the existence or absence of internal policies or training procedures are unlikely to be known prior to discovery. *See Thomas v. City of Galveston, Tex.*, 800 F. Supp. 2d 826, 842–43 (S.D. Tex. 2011) (collecting cases discussing the ability of a plaintiff alleging municipal liability under § 1983 to plead specifics regarding policies or customs). Only minimal factual allegations may be available at the motion to dismiss stage. *Id.*

Nevertheless, in order to provide fair notice to the defendant, a plaintiff must do more than simply restate the elements of a cause of action. *See Iqbal*, 556 U.S. at 678–79 (prohibiting allegations in a complaint that are no more than "[t]hreadbare recitals of a cause of action's elements"). Allegations that provide notice include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy. *Thomas*, 800 F. Supp. 2d at 842–43 & nn.11–15 (summarizing cases where plaintiffs pled sufficient facts to plausibly state a § 1983 claim against a municipality).

Here, Plaintiff provides sufficient allegations regarding the existence or absence of internal APD policies plausibly establishing constitutional violations. Most significantly, Plaintiff alleges multiple incidents of misconduct by APD officers, Officer Richter in particular, before her arrest. Am. Compl. [#12] at 8. Plaintiff describes, in detail, three recorded incidents where Officer Richter used severe force with no or negligible provocation. *Id.* Claiming Officer Richter has not been disciplined for any of these incidents, Plaintiff suggests constructive knowledge of Officer Richter's pattern of misconduct. *Id.*

In addition, citing a statement by Chief Acevedo that he is "sickened that somehow people are *still* trying to justify Richter[,]" Plaintiff adds further factual support to her allegation the City knew of its officers' use of excessive force. *Id.* at 10 (emphasis added). Chief Acevedo's use of the word "still" implies an ongoing practice that might have been common knowledge.

Similarly, citing the 2016 CPE study and the KXAN report, Plaintiff alleges facts suggesting racially-motivated law enforcement actions and excessive use of force are not limited to Officer Richter but are widespread in Austin, even when controlling for neighborhood levels of crime, education, home ownership, income, youth, and unemployment. *Id.* at 9. Although APD correctly points out the CPE study was published after Plaintiff's arrest, the study publicized data APD already possessed before Plaintiff's arrest. It is reasonable to conclude the City knew about the trends in its data before the information was published in an official study.

Additionally, Plaintiff includes the details of a recorded conversation with Officer Spradlin where he commented "But 99% of the time when you hear about stuff like that, it's the black community that's being violent." *Id.* at 7. Officer Spradlin's comment and the conversation as excerpted in the complaint suffice to imply APD officers feel permitted to use of force against black individuals. *See id.* Plaintiff also highlights statements by Chief Acevedo suggesting he, as well as other APD supervisors, already knew there was practice of disproportionately using force against minorities. *Id.* at 10 (quoting Chief Acevedo as stating, "Had that been a pretty white girl in her Sunday best dress, I don't think that Richter would have responded . . . that way."). These facts support a plausible inference that the City has a practice of racial discrimination in police actions.

Furthermore, the Plaintiff's allegations concerning the incident themselves aid in substantiating Plaintiff's allegations of a policy. Plaintiff's arrest occurred in the middle of the day

in a public parking lot. Although another officer was present, Officer Richter yanked Plaintiff off the ground by the chain of her handcuffs. *Id.* at 6. When other officers arrived and Officer Richter discussed charging Plaintiff, he stated, "If they ask what she's resisting[,] just put arrest. If they ask specifically what she was resisting[,] say arrest. They won't care about that." *Id.* His statement is enough to suggest the City avoided inquiring into an officer's true motivations for arrest or use of force. Such an inference is reinforced by Chief Acevedo's alleged statement indicating inquiry into an officer's behavior has customarily stopped at the report. *Id.* at 10 (claiming Chief Acevedo said, "'Who cares what he wrote [in the report]? Because I think we have this attitude, of I'll just cover it in the report and I'll be good to go … Anybody can do creative writing.'").

At this stage in the litigation, Plaintiff's allegations create a plausible inference the City had an informal policy or custom of, at least, tolerating police misconduct. Moreover, as the majority of use of force incidents Plaintiff describes involved multiples officers and no subsequent disciplined, Plaintiff alleges sufficient facts to suggest the City had inadequate hiring, training, or supervising policies to prevent officers from violating suspects' rights.

## B.    Moving Force

To succeed in proving the moving force element, a plaintiff must show a "a direct causal link" between the policy and the violation. *Id.* at 580. A plaintiff must demonstrate that a policymaker promulgated such a policy or custom "with deliberate indifference to the known or obvious consequences that constitutional violations" would be a direct result of that policy. *Piotrowski*, 237 F.3d at 579–80. While negligence is insufficient to meet the deliberate indifference requirement, "even a facially innocuous policy will support liability if it was promulgated with deliberate indifference . . . ." *Id.* at 579 (quoting *Bd. of Cty. Comm'rs v. Brown,* 520 U.S. 397, 404

(1997)).

Here, Plaintiff alleges the City's customs and practices relating to the use of force and the lack of discipline for officer misconduct constitutes the moving force behind the violation of her rights. In particular, as discussed above, Plaintiff provides specific allegations supporting her claim she was subjected to a use of force by Officer Richter, who has a history of prior excessive force violations. Am. Compl. [#12] at 8. Plaintiff implies if the City adequately disciplined its officers or scrutinized the practice of falsely reporting arrest resistance, Plaintiff's rights would not have been violated. *Id.* at 8–10.

Moreover, Plaintiff provides additional allegations suggesting the City maintained deliberate indifference to the likelihood of racial targeting and excessive use of force. For example, Plaintiff alleges the use of force even in situations where the severity of the crime is low. *Id.* at 9. Chief Acevedo's comments to the APD supervisors also suggest both the supervisors and Chief Acevedo collectively knew about officer misconduct but "lack[ed] the intestinal fortitude to make the tough calls." *Id.* In aggregate, these allegations plausibly state a claim that the City's informal policies or customs were a moving force for Plaintiff's constitutional deprivations and injuries.

### Conclusion

Viewed in the light most favorable to the Plaintiff, the amended complaint includes specific allegations allowing a reasonable inference the City could be liable for the alleged misconduct. In particular, Plaintiff specifies sufficient factual allegations which plausibly support the claim the City expressly or impliedly authorized excessive use of force and racial discrimination by APD officers, which caused Plaintiff's injuries. Plaintiff provides more than a boilerplate recitation of the grounds for municipal liability and has given the City fair notice of the grounds on which it is being sued.

-14-

Thus, as Plaintiff's allegations pass muster under *Twombly*, 550 U.S. at 570, and *Iqbal*, 556 U.S. at 678, the City's claims Plaintiff cannot establish municipal liability can be reconsidered through motions supported by an evidentiary record. At that time, the Court will "weed out unmeritorious claims[,]" if any. *Leatherman,* 507 U.S. at 169.

    Accordingly:

        IT IS ORDERED that Defendant City of Austin's Motion to Dismiss [#13] is DENIED.

    SIGNED this the 21ˢᵗ day of March 2017.

                                                    *Sam Sparks*
                                    SAM SPARKS
                                    UNITED STATES DISTRICT JUDGE